# Supreme Court of Texas

No. 20-0980

Wal-Mart Stores, Inc.; Wal-Mart Stores East, LP; Wal-Mart
Louisiana, LLC; Sam's East, Inc.; and Sam's West, Inc.,

*Petitioners*,

v.

Xerox State & Local Solutions, Inc. a/k/a, f/k/a ACS State & Local
Solutions, Inc.,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued September 21, 2022**

JUSTICE DEVINE delivered the opinion of the Court.

Justice Lehrmann did not participate in the decision.

In this tort and breach-of-contract suit, several affiliated retailers seek to recoup millions of dollars in disallowed reimbursements for purchases their customers made under the federally funded Supplemental Nutrition Assistance Program (SNAP). The retailers' losses arose in connection with a lengthy outage in a third-party contractor's Electronic Benefit Transfer (EBT) system. As authorized

by federal regulations, the retailers permitted their SNAP customers to make purchases during the system outage but held the EBT transactions in abeyance for later submission and reimbursement. When the EBT contractor subsequently declined reimbursement for nearly 90,000 transactions, the retailers sued for damages under negligence and negligent-misrepresentation theories and as third-party beneficiaries under the EBT contractor's agreements with state agencies. The trial court rendered a take-nothing summary judgment on the retailers' claims, and the court of appeals affirmed.

A central issue on appeal is whether the EBT contractor is insulated from liability under a federal regulation authorizing retailers to store and forward EBT transactions "at the retailer's own choice and liability." We hold that this regulation does not insulate third-party EBT contractors from liability to retailers. The court of appeals' contrary conclusion led to the erroneous affirmance of summary judgment on some of the retailers' losses and rendered the court's analysis faulty as to the retailers' tort claims. Accordingly, we (1) reverse summary judgment as to the tort claims and remand those claims to the court of appeals to consider the EBT contractor's alternative grounds for affirmance but (2) affirm summary judgment on the breach-of-contract claims because the retailers have failed to produce evidence of their status as third-party beneficiaries.

## I. Background

## A. SNAP

Congress authorized SNAP "to safeguard the health and well-being of the Nation's population by raising levels of nutrition

2

among low-income households."[1]  Subject to regulations promulgated by the U.S. Department of Agriculture (USDA),[2] state agencies administer the federally funded SNAP by distributing monthly benefits through an EBT system that allows SNAP beneficiaries to purchase food at authorized retailers with debit-like EBT cards.[3]  State agencies may contract with EBT contractors to perform services, including managing the EBT cardholder authorization system to redeem SNAP benefits.[4]  Retailers may similarly contract with third-party processors to operate the processing system for routing EBT transactions to the appropriate state authorization system.[5]  Wal-Mart Stores, Inc.; Wal-Mart Stores East, LP; Wal-Mart Louisiana, LLC; Sam's East, Inc.; and Sam's West, Inc. (collectively, Wal-Mart) are authorized SNAP retailers who retained First Data Corporation as their third-party processor.  Xerox State & Local Solutions, Inc. is the EBT contractor for sixteen states under written contracts with state agencies in each of those states.[6]  Xerox also

---

[1] 7 U.S.C. § 2011.

[2] *Id.* § 2013(c).

[3] 7 C.F.R. §§ 274.1(a), (b), .2(a).  Although Part 274 has been amended since the events giving rise to this litigation, the changes are not material to the issues on appeal; accordingly, we cite to the current version of the regulations for convenience.

[4] *Id.* § 271.2.

[5] *Id.* § 274.8(b)(10)(iv); *see id.* § 274.3(d) (distinguishing third-party processors from the state agencies' EBT contractors).

[6] Those states are Alabama, California, Georgia, Illinois, Iowa, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, New Jersey, Ohio, Oklahoma, Pennsylvania, and Virginia.

operates under a written contract with First Data but has no direct contractual relationship with Wal-Mart.

In a typical SNAP transaction, the customer uses a state-issued EBT card at a retailer's point-of-sale (POS) device and enters a personal identification number (PIN). The POS device creates and transmits transaction information to the retailer's third-party processor. The third-party processor follows the EBT contractor's specifications to develop the transaction message and sends it to the EBT contractor's mini-switch. The mini-switch receives the message and provides intra- and interstate routing to state-agency databases within the EBT contractor's host system for processing. The databases hold the relevant SNAP account information to process and authorize the EBT transactions for approval or denial. The EBT system's host computer returns an electronic response through "the switch, to the third party processors, to a store's host computer or POS device."[7]

## B. The Outage

On a Saturday in October 2013, during peak retail-transaction times, Xerox's EBT system went offline for more than 10 hours when Xerox suffered a power failure while performing unannounced, but planned, maintenance at its Dallas data center. SNAP regulations provide that when EBT systems are inaccessible, state agencies must "ensure that a manual purchase system is available for use."[8] This process uses manual vouchers and permits re-presentation of SNAP

---

[7] *Id.* § 274.2(g)(2).

[8] *Id.* § 274.8(d).

4

transactions during subsequent months.[9]  State agencies also "may opt to allow retailers, *at the retailer's own choice and liability*, to perform" what the regulations call "store-and-forward transactions," which allow retailers the opportunity to electronically store EBT transactions and then forward the transactions to the EBT contractor "one time within 24 hours of when the system again becomes available."[10]  Wal-Mart had a system in place to use the latter option to "store and forward" transactions when Xerox's EBT system was inaccessible.

Throughout the outage, Wal-Mart communicated with Xerox and First Data.  Early in the outage, some of Xerox's systems came back online, and Xerox considered "failing over" to its backup data center in Pittsburgh but chose to stay with Dallas.  At the height of the outage, Xerox's "state servers, which house the EBT programs, were not operational, but the mini-switches, communicating between servers and the third party processors, were operational."  During this brief opening in the system, Wal-Mart forwarded stored EBT transactions, but Xerox's EBT system returned a "Code 19" response.  The response description for "Code 19" is "Re-enter Transaction," which "requires the card holder to re-enter his or her PIN number."

According to Xerox, Wal-Mart's automated store-and-forward system was designed such that First Data would "remap" a Code 19 response to a Code 05 "general denial" response before returning a

---

[9] *Id.*

[10] *Id.* § 274.8(e)(1) (emphasis added).

response code to Wal-Mart.[11]  On receiving the "general denial" response, Wal-Mart's automated system removed the stored transaction from the store-and-forward queue, meaning the Code 19 transactions could no longer be re-presented to Xerox when its EBT system was back up and running.  After realizing what was occurring—and within 15 minutes of the mini-switches coming online—First Data worked with Xerox to "cut [its] links" to the mini-switches to prevent further Code 19 responses to Wal-Mart's store-and-forward transactions.

Toward the end of the outage, Xerox worked with First Data and Wal-Mart to restore the EBT processing on a state-by-state basis. During this operation, Wal-Mart's automatic store-and-forward system again submitted more transactions that were returned as Code 19 responses and remapped to "general denial" responses.  Only later that evening was Xerox's EBT system fully restored.

All told, Wal-Mart stored 420,000 transactions for re-presentment following the outage.  Of them, Xerox declined around 86,000 transactions, resulting in two categories of losses for Wal-Mart: (1) 32,000 reimbursement claims that were denied because the customers lacked sufficient benefits or used an improper PIN to complete the transaction (NSF transactions or losses); and (2) 54,000 reimbursement claims that received Code 19 responses and were refused even though the customers had sufficient SNAP benefits to cover

---

[11] Some Code 19 responses were also remapped to Code 94, which means "try again."

the purchases (Code 19 transactions or losses).[12]  Wal-Mart does not dispute that federal regulations preclude it from recouping these losses, worth around $4 million, from its customers, the states, or the federal government, but it contends Xerox is responsible for the outage and may be held liable for the ensuing losses.

### C. Procedural History

Seeking to recover those losses, Wal-Mart sued Xerox for negligence, negligent misrepresentation, and breach of contract.[13] Xerox twice moved for summary judgment.  First, Xerox moved for traditional summary judgment on all claims, arguing that, as a matter of law, "Wal-Mart bears any and all loss it may have incurred" because federal regulations provide that store-and-forward transactions are undertaken "at the retailer's own choice and liability."[14]  The trial court granted that motion in part, rendering a take-nothing summary judgment on the 32,000 NSF losses but leaving Wal-Mart's claims for the 54,000 Code 19 losses pending.

Second, in a motion for traditional and no-evidence summary judgment on the remaining claims, Xerox raised no-evidence challenges to most elements of Wal-Mart's claims and raised traditional grounds that it was entitled to judgment as a matter of law because (1) Xerox

---

[12] In addition, Wal-Mart alleged damages resulting from "losses associated with the carts of abandoned groceries and other items as a result of the Outage."

[13] Wal-Mart also asserted claims based on promissory estoppel and breach of an implied-in-fact contract but has not challenged the court of appeals' affirmance of summary judgment on those claims.

[14] *Id.*

had no duty to Wal-Mart; (2) Xerox made no false representations; (3) Wal-Mart is not an intended third-party beneficiary of Xerox's contracts with the state agencies; and (4) select provisions in some of Xerox's contracts expressly disclaim third-party beneficiaries. Xerox also raised a global traditional ground for summary judgment on the basis that Wal-Mart is the "producing cause" of all damages through its "remapping" of the Code 19 responses.

In response, Wal-Mart argued that (1) Xerox owed it a common-law duty because the damage resulting from the outage was foreseeable and Xerox voluntarily undertook responsibility for processing EBT transactions; (2) Xerox misrepresented that its system was ready to receive transactions when it was not; and (3) Wal-Mart is an intended beneficiary of certain indemnity provisions in Xerox's contracts with the state agencies. As to causation, Wal-Mart urged that Xerox's Code 19 responses were improper because (1) that code applies only to face-to-face, not store-and-forward, EBT transactions; (2) PIN security rules required Wal-Mart to remove the store-and-forward transactions from the queue after receiving a Code 19 response; and (3) even if Wal-Mart's remapping contributed to causing the damages, proportionate responsibility is a question for the jury.

The trial court granted Xerox's motion and rendered a final take-nothing judgment against Wal-Mart. The court of appeals affirmed.

The appeals court agreed with Xerox's interpretation of the federal regulation, finding it "clear in imposing liability on Wal-Mart for the risks associated with its 'store and forward' transactions," and

8

affirmed summary judgment on the losses from the 32,000 NSF transactions.[15] Relying on this holding, the court also affirmed summary judgment on the negligence and negligent-misrepresentation claims.[16] Finally, the appeals court affirmed summary judgment on Wal-Mart's breach-of-contract claims.[17] Although Wal-Mart had argued that Xerox's traditional summary judgment on the contract claims could not be based on only contract excerpts, the court concluded that (1) the relevant provisions disclaiming third-party beneficiaries were sufficient to shift Xerox's burden as a traditional summary-judgment movant; (2) Wal-Mart did not identify any missing contract provisions that might be relevant in response; and (3) Wal-Mart failed to raise a fact issue on its third-party-beneficiary status because the contracts contained specific provisions assigning liability for store-and-forward transactions to the retailer and those provisions "prevail[ed] over the more general indemnity provision."[18]

Wal-Mart's petition for review contends Xerox is not entitled to summary judgment because (1) the federal SNAP regulation insulates only the federal government, state agencies, and SNAP beneficiaries from liability for losses on store-and-forward transactions; (2) excerpted contract provisions disclaiming third-party beneficiaries are insufficient on their own to shift a traditional summary-judgment movant's burden; and (3) Wal-Mart's evidence was sufficient to raise fact issues defeating

---

[15] 646 S.W.3d 546, 554-55 (Tex. App.—Dallas 2020).

[16] *Id.* at 555-57.

[17] *Id.* at 557-61.

[18] *Id.* at 558-61.

summary judgment on its negligence, negligent-misrepresentation, and breach-of-contract claims. Xerox's response asserts, as cross-points, that the second summary judgment should be affirmed on the independent ground that Wal-Mart's "remapping" of the Code 19 responses was a "new and independent, or superseding, cause" of its damages and that Wal-Mart waived any challenge to this alternative ground for affirmance by failing to mention it in its merits brief.

## II. Discussion

We review summary judgments de novo.[19] A party moving for traditional summary judgment must prove that no genuine issue of material fact exists and it is entitled to judgment as a matter of law.[20] In comparison, a properly filed no-evidence motion shifts the burden to the nonmovant to present evidence raising a genuine issue of material fact supporting each element contested in the motion.[21] If the nonmovant brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact, summary judgment is improper.[22] In determining whether a fact issue precludes summary judgment, "we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor."[23]

---

[19] *Zive v. Sandberg*, 644 S.W.3d 169, 173 (Tex. 2022).

[20] TEX. R. CIV. P. 166a(c).

[21] *JLB Builders, L.L.C. v. Hernandez,* 622 S.W.3d 860, 864 (Tex. 2021) (citing TEX. R. CIV. P. 166a(i)).

[22] *Id.*

[23] *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

## A. The Federal SNAP Regulation

The primary dispute on appeal concerns the meaning and applicability of Section 274.8(e)(1) of the SNAP regulations, which served as the sole basis for the first summary judgment on Wal-Mart's NSF losses and undergirded the court of appeals' disposition of Wal-Mart's negligence and negligent-misrepresentation claims. Section 274.8(e)(1) provides:

> (e) *Store-and-forward.* As an alternative to manual transactions:

> (1) State agencies may opt to allow retailers, *at the retailer's own choice and liability*, to perform store-and-forward transactions when the EBT system cannot be accessed for any reason. The retailer may forward the transaction to the host one time within 24 hours of when the system again becomes available. Should the 24-hour window cross into the beginning of a new benefit issuance period, retailers may draw against all available benefits in the account.[24]

The crux of the dispute between Wal-Mart and Xerox is whether the regulation insulates an EBT contractor from liability to a retailer under state common-law theories. Xerox argues that "at the retailer's own choice and liability" means Wal-Mart "bears any and all loss it may have incurred on any 'store-and-forward' transaction as a matter of law" and "assumes all liability for those transactions—no matter what." Wal-Mart contends that Section 274.8(e)(1) does not provide Xerox with "blanket immunity . . . no matter what it did" and instead contemplates the retailer assuming liability for losses only as against the

---

[24] 7 C.F.R. § 274.8(e)(1) (emphasis added).

governmental entities and program beneficiaries. In Wal-Mart's view, Xerox's interpretation would result in federal preemption of state-law claims without any apparent congressional intent to bar such claims.

The parties have not identified, nor have we found, any authority construing Section 274.8(e)(1) as it pertains to relieving EBT contractors from liability for state-law claims. When presented with a federal question of first impression, we look to "how the U.S. Supreme Court would decide the issue," "often draw[ing] on the precedents of other federal courts, or state courts, to determine the appropriate answer."[25] In interpreting regulations, the U.S. Supreme Court uses the "traditional tools" of construction and carefully considers "the text, structure, history, and purpose of a regulation," which "will resolve many seeming ambiguities out of the box."[26] Applying this approach, we conclude that Section 274.8(e)(1) is not "genuinely ambiguous"[27] and does not insulate an EBT contractor from state common-law liability.

---

[25] *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 189 (Tex. 2009).

[26] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). As we do, federal courts interpret regulations by applying similar construction principles used to interpret statutes. *See Mitchell v. C.I.R.*, 775 F.3d 1243, 1249 (10th Cir. 2015) ("In interpreting the relevant regulations, we apply the same rules we use to interpret statutes."); *Patients Med. Ctr. v. Facility Ins. Corp.*, 623 S.W.3d 336, 341 (Tex. 2021) ("We interpret administrative rules using the same principles we apply when construing statutes."); *see also In re Facebook, Inc.*, 625 S.W.3d 80, 87 (Tex. 2021) (noting that the U.S. Supreme Court has "stated principles of statutory interpretation with which we agree"); *In re Acad., Ltd.*, 625 S.W.3d 19, 25 (Tex. 2021) ("In analyzing federal statutes, we apply principles substantially similar to those that govern our interpretation of Texas law.").

[27] *See Kisor*, 139 S. Ct. at 2415.

Interpretation of the regulation begins with its text, which grants permissive authority subject to two conditions precedent: a retailer may perform store-and-forward transactions if (1) the state agency opts to allow it and (2) the EBT system cannot be accessed for any reason.[28] The parties agree that both conditions precedent were satisfied here. Accordingly, the regulations authorized Wal-Mart to exercise the option to store and forward transactions at its own "liability."

The parties' interpretive disagreement rests on the breadth of the word "liability," which generally refers to "[t]he quality, state, or condition of being legally obligated or accountable; legal responsibility *to another or to society*, enforceable by civil remedy or criminal punishment."[29] The parties agree that the scope of the retailer's "liability" for store-and-forward transactions applies such that the retailer bears the risk in relation to the USDA, state agencies, and SNAP beneficiaries. But the term "liability" on its own does not delineate whether the scope is limited to allocating the risk to the retailer only as to those relationships or also extends beyond those relationships to relieve third parties from liability to the retailer under state law.[30]

---

[28] 7 C.F.R. § 274.8(e)(1).

[29] *Liability*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added).

[30] *See, e.g.*, Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 105-06 (2012) (noting that sometimes the scope of a general term is unclear).

"Context is a primary determinant of meaning."[31]  In considering the context, there is a presumption of consistent usage: "A word or phrase is presumed to bear the same meaning throughout a text."[32] Being "mindful" of that presumption,[33] we note that in another section of the SNAP regulations, "liability" in the context of lost or stolen EBT cards is allocated as follows: "Once a household reports that their EBT card has been lost or stolen, the State agency shall assume liability for benefits subsequently drawn from the account and replace any lost or stolen benefits to the household."[34]  If the word "liability" bore the breadth Xerox suggests, a state agency would be precluded from suing to recover SNAP benefits from thieves and embezzlers, but such a construction would be contrary to a fair reading of that provision.  The presumption of consistent usage indicates that "liability," when used in the SNAP regulations, does not necessarily preclude a party with assigned "liability" from seeking recovery from at least some other persons or entities under state common-law theories.

The structure of the SNAP regulations also supports this reading, especially considering how Subsections (d) and (e) of Section 274.8 relate to each other.  Subsection (e) describes store-and-forward transactions "[a]s an alternative to manual transactions,"[35] which are

---

[31] *Id.* at 167.

[32] *Id.* at 170.

[33] *See S.C. v. M.B.*, 650 S.W.3d 428, 445 (Tex. 2022).

[34] 7 C.F.R. § 274.6(b)(2).

[35] *Id.* § 274.8(e).

discussed in the immediately preceding Subsection (d).[36] But unlike the regulation for store-and-forward transactions, the regulation governing manual vouchers provides that the state agency "may accept liability for manual purchases within a specified dollar limit" and "shall be strictly liable for manual transactions that result in excess deductions from a household's account."[37] "The Department," on the other hand, "shall not accept liability under any circumstances for the overissuance of benefits due to the utilization of manual vouchers."[38] Moreover, the opportunity to re-present the manual vouchers and the amount to be debited is limited and requires notice to the SNAP beneficiaries.[39] Reading these subsections together and in context, as the "traditional tools" of construction require,[40] the regulations allocate liability among the USDA, state agencies, and retailers to protect the SNAP beneficiaries when using back-up procedures—manual vouchers and store and forward—during a system outage. But the regulations related to back-up procedures do not contemplate the liability of other parties, for example, as between an EBT contractor and a retailer.

---

[36] *Id.* § 274.8(d).

[37] *Id.* § 274.8(d)(4), (5).

[38] *Id.* § 274.8(d)(4).

[39] *Id.* § 274.8(d)(1)–(3).

[40] *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."); *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017) (noting that we consider provisions within the context of the entire framework and construe text "as a whole" not in "isolation").

Finally, reading "liability" as limited to describing the allocation of risk among the federal government, state agencies, SNAP beneficiaries, and the entity being assigned "liability"—here, the retailer—is consistent with the history and purpose of the regulation. In 1992, the USDA recognized in the preamble to its regulations that "there must be a back-up system available for use whenever any component of the EBT system malfunctions" because "[i]t is essential that households have a means to purchase food when any part of the system is unavailable."[41]  The USDA noted that the "greatest concern" of commenters was "the liability associated with back-up transactions and when re-presentation against a household's future benefits may take place."[42]  At that time, the USDA continued with "requir[ing] that liability for overdraws resulting from manual transactions rest[s] with the State agency."[43]  But the USDA provided that the agency "can pass this liability on to other parties through negotiations as appropriate for its circumstances."[44]

---

[41] Standards for Approval and Operation of Food Stamp Electronic Benefit Transfer Systems, 57 Fed. Reg. 11213, 11247 (Apr. 1, 1992); *see* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 218 (2012) (noting that although prefatory materials like a preamble "cannot give words and phrases of the dispositive text itself a meaning that they cannot bear," they are "appropriate guide[s] to meaning" and "ought to be considered along with all other factors in determining *whether* the instrument is clear").

[42] Standards for Approval and Operation of Food Stamp Electronic Benefit Transfer Systems, 57 Fed. Reg. at 11247.

[43] *Id.*

[44] *Id.*

In 2001, the USDA presented store and forward as an alternative "preferable to manual vouchers for some retailers who do not wish to spend time obtaining telephone authorization for the transaction when the system is down."[45] In the proposed rule, the USDA would allow retailers to use store and forward for those "who elect to assume liability for these transactions," with one opportunity to forward the transaction within 24 hours "to protect against applying the transaction to future months' benefits."[46] In 2005, the USDA authorized store and forward in an interim rule, noting and addressing commenters' concerns that store-and-forward procedures provide a "potential for fraud" and overdrafts.[47]

The regulatory history and concerns raised during the adoption process evince overarching objectives of the store-and-forward process: (1) to ensure SNAP beneficiaries can purchase food with their SNAP benefits during outages, (2) to provide a more efficient method for retailers when manual vouchers might not be feasible so they are encouraged to participate in SNAP during outages, and (3) to protect the public fisc and SNAP beneficiaries from increased potential liability or unexpected or fraudulent withdrawals from SNAP accounts. Neither the promulgation process nor the regulation's text indicates regulatory

---

[45] Food Stamp Program, Regulatory Review: Standards for Approval and Operation of Food Stamp Electronic Benefit Transfer (EBT) Systems, 66 Fed. Reg. 36495, 36500 (proposed July 12, 2001).

[46] *Id.* at 36500-01.

[47] Food Stamp Program, Regulatory Review: Standards for Approval and Operation of Food Stamp Electronic Benefit Transfer (EBT) Systems, 70 Fed. Reg. 18263, 18268-69 (Apr. 11, 2005).

concern about allocating liability between retailers and EBT contractors.

Separately and collectively, the federal regulation's text, structure, history, and purpose point in the same direction: Section 274.8(e)(1) does not insulate EBT contractors from liability to retailers under state common-law claims. Xerox's contrary reasoning, on the other hand, would allow an EBT contractor to escape independently negotiated contractual obligations with a retailer and avoid liability not only for its negligent conduct but also for intentional torts related to store-and-forward losses. If EBT contractors are not incentivized to minimize the risks of outages, retailers might be more likely to turn away SNAP customers during outages, limiting their options to purchase food. Such a construction runs counter to regulatory objectives.[48]

---

[48] Xerox nevertheless argues that a 2015 USDA letter to Wal-Mart supports its construction of the regulation. In 2015, nearly two years after the outage at issue here, Wal-Mart experienced losses in connection with a similar EBT system outage and asked the USDA to provide an adjustment for denied store-and-forward transactions. The USDA denied the request, noting that when SNAP recipients have insufficient funds or use invalid PINs, "the retailer must be willing [to] accept the loss of funds." Xerox asserts that this letter reflects the agency's construction of Section 274.8(e)(1) as insulating EBT contractors from liability to retailers and that the agency's construction is entitled to deference. We cannot agree with Xerox's characterization of the letter, which only involves Wal-Mart's attempt to recover from the USDA. The letter does not—in any way, shape, or form—address an EBT contractor's liability under Section 274.8(e)(1). Even if it could be so construed, "a court should not afford *Auer* deference [to an agency's interpretation of its regulations] unless the regulation is genuinely ambiguous," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019), and this regulation is not.

Moreover, by concluding that Section 274.8(e)(1) barred Wal-Mart's contract and tort claims for the NSF losses, the court of appeals effectively held that the federal regulation preempted those common-law claims.[49] But there is a "presumption against preemption" because "respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state-law causes of action.'"[50] The presumption "does not rely on the absence of federal regulation" and instructs that federal law should not be read to preempt state law "'unless that was the clear and manifest purpose of Congress.'"[51] The parties have not identified, nor have we found, a clear and manifest purpose of Congress intending to preempt such state common-law claims. Thus, even if Xerox had provided a plausible alternative construction given the regulation's text, structure, history, and purpose and even if the regulation were ambiguous, we

---

[49] *See* 646 S.W.3d 546, 554-55 (Tex. App.—Dallas 2020).

[50] *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

[51] *Id.* at 565 & n.3 (quoting *Medtronic*, 518 U.S. at 485). We have noted that a "doctrinal dispute" exists as to whether the presumption applies when a statute contains an express preemption clause. *See In re Facebook, Inc.*, 625 S.W.3d 80, 88 n.5 (Tex. 2021) (collecting cases). As in *In re Facebook*, we need not resolve this doctrinal dispute. *See id.* We have found no SNAP Act provision expressly preempting these types of state common-law claims, although at least one court has concluded that provisions of the SNAP Act unrelated to this case expressly preempt other types of state law. *See Barry v. Corrigan*, 79 F. Supp. 3d 712, 750 (E.D. Mich. 2015) ("Sections 2014(b) and 2020(e)(5) of the SNAP Act expressly preempt state eligibility requirements that exceed the federal eligibility requirements."), *aff'd sub nom. Barry v. Lyon*, 834 F.3d 706, 718 n.5 (6th Cir. 2016) (noting that the "district court also found that preemption principles provided a second, independent basis for finding Michigan's law and policy invalid" without addressing this alternative ground).

would construe the regulation consistent with the presumption against preemption.

We therefore conclude that the court of appeals erred in construing Section 274.8(e)(1) to insulate Xerox from liability for the 32,000 NSF losses. We reverse the court of appeals' judgment on those losses.

### B. Negligence and Negligent Misrepresentation

Relying on its construction of Section 274.8(e)(1), the court of appeals also affirmed summary judgment on Wal-Mart's negligence and negligent-misrepresentation claims. But the court's erroneous construction of Section 274.8(e)(1) rendered its analysis faulty as to these tort claims.

To support its negligence claim, Wal-Mart asserts that a duty exists under common-law theories, either by applying what we have called the "*Phillips* factors" or based on Xerox's voluntary undertaking of services.[52] The court of appeals concluded that Xerox had no duty because Section 274.8(e)(1) places "the risk of using 'store and forward' transactions . . . on Wal-Mart."[53] Although a background regulatory framework may be considered in a *Phillips*-factor analysis,[54] the court

---

[52] *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 149-52 (Tex. 2022) (describing the *Phillips*-factor inquiry and discussing the requirements for a voluntary-undertaking theory).

[53] *See* 646 S.W.3d 546, 557 (Tex. App.—Dallas 2020). In the court of appeals, Wal-Mart also relied on contractual and regulatory sources for the existence of a duty, which the court rejected. *Id.* at 556-57. Because Wal-Mart does not rely on those theories here, we do not opine on their respective merits.

[54] *See, e.g.*, *Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 714-15 (Tex. 2003) (declining to impose a duty after "[a]pplying the

erred by relying on an improper interpretation of Section 274.8(e)(1) without weighing the *Phillips* factors or considering Wal-Mart's voluntary-undertaking theory.

Wal-Mart's negligent-misrepresentation claim primarily rests on alleged representations that Xerox's EBT system was ready to receive transactions when it was not. Wal-Mart argues that, based on these representations, it submitted the transactions before the EBT system could process them, which resulted in Xerox returning a Code 19 response and prevented Wal-Mart from re-presenting those transactions when the system was eventually operational. The court of appeals noted, however, that "[a]ll of Xerox's alleged 'misrepresentations' occurred as part of attempts to restore the system" and "Wal-Mart seeks to isolate very specific steps in the day-long process of restoring the system and label these as 'misrepresentations.'"[55] Relying on its interpretation of Section 274.8(e)(1) that "the risk of using 'store and

---

*Phillips* risk/utility factors" because, in part, the "comprehensive statutory and regulatory scheme" reduces the risk of harm).

[55] 646 S.W.3d at 556. The negligent-misrepresentation elements are: (1) the defendant made a representation in the course of its business or in a transaction in which it has a pecuniary interest; (2) the representation conveyed "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653-54 (Tex. 2018). Xerox raised a no-evidence challenge to each element except the first and also a traditional summary-judgment ground that Xerox did not make any false representations as a matter of law, relying on testimony from a Wal-Mart employee who was on the phone with First Data and Xerox throughout the outage. Wal-Mart's employee testified he did not recall anyone saying, "Okay. Submit them all. Now's the time to send over all the transactions."

forward' transactions was on the retailer, Wal-Mart," the court of appeals then held that "the 'misrepresentations' identified by Wal-Mart were not negligent misrepresentations that would subject Xerox to liability."[56]

Because the court relied on an erroneous construction of Section 274.8(e)(1) in affirming summary judgment on Wal-Mart's negligence and negligent-misrepresentation claims, we reverse that portion of the court's judgment and remand those claims to the court of appeals for reconsideration in light of this opinion.

### C. Superseding Cause and Waiver

Among the alternative grounds for affirmance, Xerox argues in its merits brief that (1) the second summary judgment may be affirmed on the global "superseding" cause ground[57] that Wal-Mart's vendor, First Data, had remapped the Code 19 responses to general-denial codes and (2) Wal-Mart waived its right to seek reversal of the judgment because it did not address causation in its merits brief in this Court. Because this causation ground was briefed in but not considered by the court of appeals, Wal-Mart could raise the issue in a reply brief "[t]o obtain a remand to the court of appeals" or "to request that the Supreme

[56] 646 S.W.3d at 556. The precise basis for the court of appeals' holding is unclear as the court did not identify the element of Wal-Mart's negligent-misrepresentation claim on which it affirmed the trial court's no-evidence summary judgment. However, the court's erroneous interpretation of Section 274.8(e)(1) prominently supported its conclusion that the identified misrepresentations "were not negligent misrepresentations that would subject Xerox to liability." *Id.*

[57] In its motion for traditional and no-evidence summary judgment, Xerox referred to this ground as a "producing cause" but in its merits briefing now refers to it as a "new and independent, or superseding, cause."

Court consider such issues or points."[58]  While we have discretion to take up the causation issue, we adhere to our usual practice of remanding to the appeals court to consider the unaddressed issues.[59]

We now turn to the breach-of-contract claim, which the court of appeals disposed of without relying on its construction of Section 274.8(e)(1).

### D. Breach of Contract: Third-Party Beneficiary

Generally, the contractual benefits and burdens belong solely to the contracting parties, but a qualifying third-party beneficiary may sue for damages caused by the breach of the contract.[60]  To establish its third-party-beneficiary status, the plaintiff must demonstrate that the contracting parties intended to secure a benefit to it and contracted

---

[58] *See* TEX. R. APP. P. 53.4 (authorizing this Court to either remand or consider issues briefed in "but not decided by" the court of appeals).  After describing Xerox's causation argument but did not address it other than to note in a cursory sentence that Wal-Mart had "ignore[d]" it.  646 S.W.3d 546, 553-54, 56 (Tex. App.—Dallas 2020).

[59] *See Tex. Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 550-51 (Tex. 2022) ("[O]rdinarily a case will be remanded to the court of appeals for further proceedings when we reverse the judgment of the appeals court and the reversal necessitates consideration of issues raised in but not addressed by that court." (quoting *State v. Ninety Thousand Two Hundred Thirty-Five Dollars & No Cents in U.S. Currency ($90,235)*, 390 S.W.3d 289, 294 (Tex. 2013))).

[60] *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017).  Although none of the contracts at issue involved the state of Texas, we apply Texas law because Wal-Mart agrees it "is appropriate [to do so] when there is no difference between Texas law and competing jurisdictions on the basic points of law necessary for this appeal."  *See El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 144 n.26 (Tex. 2012) (presuming the laws of other states are the same as Texas law when the parties have not pointed to any material difference).

directly for its benefit; in other words, the contracting parties "must have intended to grant the third party the right to be a 'claimant' in the event of a breach."[61] The controlling factor is whether sufficiently clear and unequivocal language demonstrates such intent.[62]

As a threshold matter, the parties disagree about Xerox's obligation to submit the subject contracts in their entirety to satisfy its burden on traditional summary judgment to establish that Wal-Mart is not a third-party beneficiary. We hold that submitting the entire contract was not necessary to shift the burden to Wal-Mart to identify other contract language, if any, that is necessary to explain, complete, or contextualize the passages Xerox relied on to support its motion. Wal-Mart also argues that, even if the burden shifted, excerpts of contractual indemnity provisions that it produced in the trial court raise a genuine fact issue on its third-party-beneficiary status. We disagree on this count as well.

### 1. Traditional Summary-Judgment Burden

When a defendant moves for traditional summary judgment on a plaintiff's claim—as Xerox did here—it must demonstrate that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[63] If the movant meets that burden, the burden shifts to the nonmovant to present evidence raising a fact issue, but the burden does not shift if the movant does not satisfy its initial

---

[61] *First Bank*, 519 S.W.3d at 102.

[62] *Id.* at 103.

[63] TEX. R. CIV. P. 166a(c); *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014).

burden.[64] Summary-judgment motions must stand or fall on their own merits, and the nonmovant has no burden unless the movant conclusively establishes its cause of action or defense.[65]

As the traditional summary-judgment movant seeking to conclusively negate Wal-Mart's status as a third-party beneficiary, Xerox bore the burden of establishing that the contracting parties either did not "intend[] to secure a benefit" to Wal-Mart or did not "enter[] into the contract directly" for Wal-Mart's benefit.[66] Xerox provided excerpts from its contracts with state agencies in six states[67] that expressly disclaimed third-party beneficiaries with language such as "[t]here are no third party beneficiaries to this Contract" or "[n]othing contained in this Contract shall give to or allow any claim or right of action whatsoever by any other third person."[68]

In reviewing third-party-beneficiary disclaimers, we have given great weight to the expression of the contracting parties' intent not to create third-party beneficiaries.[69] But we also have considered other provisions within the contract to determine whether they could be

[64] *Amedisys*, 437 S.W.3d at 511.

[65] *Id.* at 511-12.

[66] *First Bank*, 519 S.W.3d at 103 (quoting *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002)).

[67] Those states are California, Georgia, Iowa, Louisiana, Massachusetts, and Mississippi.

[68] On appeal, Wal-Mart neither discusses any variation in the language of the six contracts nor contests that the excerpts expressly disclaim third-party beneficiaries.

[69] *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651-52 (Tex. 1999).

25

harmonized with or were rendered "wholly meaningless" by the disclaimer.[70] And we have often stated that contract provisions must be interpreted in the context of the entire contract.[71] In those cases, however, the parties had provided the entire contracts, and we interpreted the contracts in light of the entire evidentiary record. But we have never held that excerpted contract provisions disclaiming third-party beneficiaries lack meaning or are ambiguous for want of the entire contract. Indeed, an express disavowal of third-party beneficiaries is often clear on its own, even without the remainder of the contract.[72]

---

[70] *See id.* at 652. We have not decided whether express disclaimers are dispositive and irrebuttable proof regardless of other provisions, but we note that at least one prominent contract treatise appears to have taken that view. *See* 9 John E. Murray, CORBIN ON CONTRACTS § 44.4 (rev. ed. 2007) ("Where parties expressly deny any intention of conferring rights upon a third party . . . the critical question of whether they intended to benefit the third party is resolved.").

[71] *See, e.g.*, *First Bank*, 519 S.W.3d at 102 ("To determine whether the contracting parties intended to directly benefit a third party and entered into the contract for that purpose, courts must look solely to the contract's language, construed as a whole."); *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) ("When discerning the contracting parties' intent [to directly benefit a third party], courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless."); *Stine*, 80 S.W.3d at 589 ("To determine the parties' intent, courts must examine the entire agreement when interpreting a contract and give effect to all the contract's provisions so that none are rendered meaningless."); *MCI Telecomms.*, 995 S.W.2d at 652 ("When interpreting a contract, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless.").

[72] *See First Bank*, 519 S.W.3d at 103 (noting that "a contract may expressly provide that the parties do *not* intend to create a third-party beneficiary" and that we have concluded that a contract did not create

26

Creating a bright-line rule that summary judgment on a contract claim may be avoided unless the movant attaches the entire contract to the motion has superficial appeal but would give rise to needless impracticalities and difficulties. For example, determining what the "entire" agreement is becomes complicated when other documents are incorporated by reference. It is also not uncommon for contracts to contain potentially sensitive, yet irrelevant, information. To require the movant to always attach an entire contract despite an express disclaimer like the ones here would unduly burden the movant and, more importantly, the trial court with unnecessary disputes about "completeness" and the need for confidentiality orders. Any benefits inuring from a bright-line rule are grossly outweighed by the burdens that it would impose. Accordingly, we decline to adopt such a rule.

We instead hold that an express disclaimer provision, even if presented only in excerpted form, is sufficient, if not rebutted, to establish the movant's entitlement to summary judgment. That is, such evidence, when attached to a summary-judgment motion, shifts the burden to the nonmovant to produce evidence raising a genuine fact issue as to third-party-beneficiary status in light of the express

third-party beneficiaries when it "expressly disclaimed any intent to create third-party beneficiaries" notwithstanding that "the contract prohibited one party from interfering with third parties' 'existing prior rights'"); *MCI Telecomms.*, 995 S.W.2d at 651 (noting that "the unambiguous language" of a particular contract provision "indicates that [the contracting parties] specifically intended not to secure a direct benefit to . . . any other nonsignatory").

disclaimer.[73] We acknowledge that, in the context of an alleged third-party-beneficiary relationship, the movant is often the party with better access to the original contract.[74] But the nonmovant is not bereft of tools to protect itself from summary judgment. Our rules provide that the nonmovant may seek a continuance to obtain discovery, should it be needed, to respond to a summary-judgment motion.[75] As a result, the nonmovant can supplement the record with other provisions or the entire contract as necessary to provide a more complete picture. As the nonmovant, Wal-Mart had this opportunity and took advantage of it by submitting other provisions providing for indemnification.

## 2. Third-Party-Beneficiary Status

Having concluded that Xerox satisfied its traditional summary-judgment burden on the six contracts with express disclaimers of third-party beneficiaries, we now consider whether Wal-Mart's evidence of other contract provisions providing for indemnification raised a genuine issue of material fact when the burden shifted.[76] Wal-Mart relied on the same type of evidence to defeat Xerox's

---

[73] *Cf. Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 517 (Tex. 2014) (describing how "prima facie evidence" could shift summary-judgment burden); *Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008) (holding that the summary-judgment movant presented "prima facie evidence" to support judgment as a matter of law and that certain additional details need not be proved until nonmovants raised a fact question).

[74] *Cf. Paragon Sales Co. v. N.H. Ins. Co.*, 774 S.W.2d 659, 661 (Tex. 1989) ("In a situation such as the case at bar, a third party beneficiary is even less likely than the insured to have access to the original documents.").

[75] *See* TEX. R. CIV. P. 166a(g); *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 647 (Tex. 1996).

[76] *See* TEX. R. CIV. P. 166a(c).

no-evidence challenge for the other ten state contracts that did not have express disclaimers.[77] We conclude that the indemnity provisions Wal-Mart relied on are no evidence that the contracting parties intended to benefit a retailer using store and forward under federal regulations.[78]

Although a contract need not "expressly" name an intended third-party beneficiary,[79] a contract that fails to identify any "specific, limited group of individuals" to which the consenting parties owed an obligation does not create any third-party beneficiaries.[80] Xerox's contracts with the state agencies do not specifically name Wal-Mart (or any other authorized SNAP retailer) as an intended beneficiary.

---

[77] In its traditional summary-judgment motion, Xerox provided affidavit testimony from Joseph Froderman, its vice president of payment services and product delivery, regarding the contracting parties' intent with respect to all sixteen contracts:

> My understanding of the contracts between the States and [Xerox] is that they are not entered with the intent that any of the 200,000 retailers throughout the United States would be able to enforce them. I do not believe that either the States or [Xerox] would enter a contract subjecting the parties to contractual liability of such magnitude.

Wal-Mart argues that this extrinsic evidence is irrelevant because it does not reference the contents of the contracts and because extrinsic evidence is only admissible where a contract is ambiguous or unavailable. Because we conclude that Wal-Mart did not produce any evidence of its third-party-beneficiary status, we need not consider whether the affidavit testimony was sufficient to satisfy Xerox's traditional summary-judgment burden as to the contracts without express disclaimers.

[78] *See* 7 C.F.R. § 274.8(e).

[79] *See Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 195 (Tex. 2007).

[80] *First Bank v. Brumitt*, 519 S.W.3d 95, 103 (Tex. 2017).

Instead, the contractual provisions before us generally refer to (1) a merchant "participant," as defined by the National Automated Clearing House Association's (NACHA's) Quest Rules, which are standards for the distribution of SNAP benefits under the Quest service mark governing electronic benefits, or (2) a retailer performing certain functions. Wal-Mart identifies two categories of evidence addressing these general references that purportedly raise a fact issue on its third-party-beneficiary status.[81]

First, Xerox's contracts with state agencies in thirteen of the sixteen states incorporate the Quest Rules,[82] which were included in the summary-judgment record. Wal-Mart points to a general indemnity provision at the end of the Quest Rules in Section 10.3:

> Each Processor . . . shall indemnify and hold harmless each other Participant against any and all claims, losses, costs, damages, liabilities or expenses (including reasonable attorneys' fees) that are incurred as a result of a Transaction or attempted Transaction and that arise out of:
>
> a. The Authorization or denial of Authorization of a Transaction by such Processor . . . ;

---

[81] These contracts are not typical private contracts but are, instead, contracts with state agencies implementing a federal program. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011) (noting that "[t]he distinction between an intention to benefit a third party and an intention that the third party should have the right to enforce that intention is emphasized where the promisee is a governmental entity" (quoting 9 John E. Murray, CORBIN ON CONTRACTS § 45.6 (rev. ed. 2007))). Given our disposition and the arguments presented, however, we do not address this potential distinction.

[82] Those states are Alabama, California, Georgia, Iowa, Maine, Maryland, Massachusetts, Michigan, Mississippi, New Jersey, Ohio, Pennsylvania, and Virginia.

b. Malfunction of or failure to operate the . . . system for processing and routing Transactions (unless such malfunction was caused by the party claiming indemnification);

c. Unauthorized access being obtained to the systems utilized to process, route and authorize Transactions from any point in such system that is under the ownership or control of such Processor;

d. The failure of the Processor to comply, as to any Transaction, with any Applicable Law;

e. The negligence or fraudulent conduct of the Processor;

f. The failure of the Processor to comply with these Rules; and

g. The Completion by the Processor of any Transaction denied by, or on behalf of, an Issuer.

The Quest Rules define "Participant" to include a "Merchant" "that has entered into an agreement to participate in the routing and processing of Transactions and servicing of Cardholders or NACHA." On appeal, the parties do not contest Xerox's status as a "Processor" or Wal-Mart's status as a "Merchant" "Participant" for the contracts that incorporated the Quest Rules.

Wal-Mart claims that this general indemnity provision—specifically Subsections (b) and (e) regarding malfunction and negligence—is at least some evidence of its third-party-beneficiary status.[83] Xerox responds that a more specific provision in the Quest

---

[83] As support, Wal-Mart cites *Paragon Sales Co. v. New Hampshire Insurance Co.*, 774 S.W.2d 659, 661 (Tex. 1989) (holding that evidence of an indemnity agreement is some evidence to confer standing as a third-party beneficiary). We assume without deciding that the general indemnity

Rules governs over the general indemnity provision and demonstrates that a retailer using store and forward is not an intended third-party beneficiary to the contract. To that end, Section 3 of the Quest Rules provides: "Each Acquirer and its respective Merchants shall bear the risk of denial, for any reason, of a Store and Forward Food Stamp Transaction or Manual Food Stamp Transaction for which Telephone Authorization was not received."

In construing contracts, we look to the plain language as the written expression of the parties' intent.[84] Consistent with our long-established precedent that provisions should be considered together and harmonized, when possible, so that none will be rendered meaningless, "a specific contract provision controls over a general one."[85]

Wal-Mart argues there is no tension between the two provisions if Section 3 is construed to bear the same meaning as the federal regulation Section 274.8(e)(1), which does not allocate the risk between a retailer and an EBT contractor. But Section 3's language is markedly different. Unlike the federal regulation's "at the retailer's own choice and liability" language, Section 3 modifies "denial" with "for any reason"

---

provision in Section 10.3 would, on its own, be some evidence of third-party-beneficiary status for a nonsignatory "Participant."

[84] *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019).

[85] *Id.* at 889.

without qualification.[86]  The plain meaning of "for any reason" would include an EBT contractor's negligence or the malfunction of its system.

Despite any tension between Sections 3 and 10.3, we may still give the provisions "their plain meaning and enforce them without rendering either provision entirely superfluous."[87]  For example:

> Note that the general/specific canon does not mean that the existence of a contradictory specific provision voids the general provision.  Only its application to cases covered by the specific provision is suspended; it continues to govern all other cases.  So if a lease provides in one clause that water is provided, and in another it provides that the tenant is responsible for all utilities, the tenant will still be liable to pay for all utilities other than water.[88]

Construing Sections 3 and 10.3 together to enforce them without rendering either provision entirely superfluous, we interpret Section 3 as carving out retailers utilizing store-and-forward transactions as an exception from the general indemnity contained in Section 10.3 for the

---

[86] The federal regulation also includes the phrase "for any reason."  In contrast to Section 3, however, the regulatory phrase "for any reason" modifies "when the EBT system cannot be accessed" as a condition precedent for retailers "to perform store-and-forward transactions."  7 C.F.R. § 274.8(e)(1) ("State agencies may opt to allow retailers, at the retailer's own choice and liability, to perform store-and-forward transactions when the EBT system cannot be accessed for any reason.").

[87] *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 531 (Tex. 2015).

[88] Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 184 (2012); *see El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 814 (Tex. 2012) (Guzman, J., dissenting) (collecting authorities and noting that "[t]o harmonize conflicting [contract] provisions, we treat narrow provisions as exceptions to general provisions").

denial of those transactions.[89]  So when read together with Section 3, Section 10.3 is no evidence that the contracting parties intended to grant a retailer using store-and-forward transactions the right to be a claimant.[90]

Second, Wal-Mart argues that Xerox's contracts with the state agencies required Xerox to indemnify retailers for a state-specific amount during "[s]tand-in processing" and that this indemnification is evidence that Xerox and the states intended to benefit retailers like Wal-Mart.  In its response to Xerox's second motion for summary judgment, Wal-Mart described "stand-in processing" as when the EBT contractor guarantees that, during unplanned system unavailability, retailers may authorize EBT transactions up to an amount specified by the state by using emergency manual vouchers without requiring advance authorization.[91]

As evidence of this contractual indemnification obligation for retailers during stand-in processing, Wal-Mart provided excerpts from various states' requests for proposals (RFPs) to provide EBT services

---

[89] This interpretation is also supported by the canon: "In harmonizing [contract] provisions, terms stated earlier in an agreement must be favored over subsequent terms." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

[90] *See First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017).

[91] In another motion during the trial court proceedings, Wal-Mart noted that "[e]mergency vouchers, also known as stand-in processing," involve a process where the transactions are "recorded at the point of sale on paper vouchers."  SNAP regulations provide for stand-in processing by authorizing that "the State agency, in consultation with authorized retailers and with the mutual agreement of the State agency's vendor, if any, may accept liability for manual purchases within a specified dollar limit."  7 C.F.R. § 274.8(d)(4).

and Xerox's responses to those RFPs.[92]  For example, Xerox's response to Louisiana's RFP states that when Xerox "authorizes a transaction while in stand-in processing mode and there are insufficient funds available to cover the purchase," Xerox "compensates the retailer for the amount of the deficiency up to the $50.00 threshold," which provides "the retailer with protection from loss" and acts as an "incentive for their participation in the EBT program."  Wal-Mart also references an internal email that Xerox's vice president of card-products management sent during the outage.  With a subject line of "Xerox stand-in vouchers," the email states: "Many of our EBT states have a contractual requirement for us to stand-in for $25-$40/transaction during system outages that are our fault.  This would qualify.  We have not been broadcasting it at all but if retailers are using [stand-in vouchers], then we will have some liability."

This evidence, however, concerns a retailer using emergency manual vouchers during stand-in processing, and it is undisputed that Wal-Mart used only store-and-forward transactions during the outage, not manual vouchers.  In fact, Wal-Mart's corporate representative testified that manual vouchers are a "process which we no longer do," and Wal-Mart's expert explained that "[i]t is not practical to support manual vouchers in a high volume, multi-lane supermarket

---

[92] Wal-Mart included in the summary-judgment record an EBT RFP Guidance handbook from the USDA that states, "The contract usually consists of the RFP, the winning proposal, final negotiations that modify either the RFP or the proposal, and other documents."

environment where speed of checkout is critical."[93]  Once again, Wal-Mart's evidence does not raise a fact issue on whether the contracting parties intended to grant a retailer using only store-and-forward transactions the right to be a claimant.

We therefore conclude that the court of appeals did not err in affirming summary judgment on Wal-Mart's breach-of-contract claim because (1) Xerox established as to six contracts that Wal-Mart was not a third-party beneficiary; (2) Wal-Mart did not produce evidence raising a genuine issue of material fact when the burden shifted; and (3) as to the other ten contracts, Wal-Mart failed to produce evidence raising a fact issue in response to Xerox's no-evidence challenge.

### III. Conclusion

For the reasons stated, we affirm the court of appeals' judgment on Wal-Mart's breach-of-contract claim, reverse the judgment on the losses from the NSF transactions and on Wal-Mart's tort claims, and remand the case to the court of appeals for further proceedings.

John P. Devine
Justice

**OPINION DELIVERED:** March 17, 2023

---

[93] Xerox asserted in its briefing that because of Wal-Mart's expert testimony, manual vouchers are "a moot topic for this case." At oral argument Xerox's counsel stated, "The other indemnity provisions . . . are from provisions in bid documents . . . relating to manual transactions, which of course are not part of this case. Wal-Mart was never going to do that[.]" Wal-Mart did not contest or respond to these statements.

36